T.C. Memo. 2016-161

UNITED STATES TAX COURT

SCOTT SINGER INSTALLATIONS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6393-14, 16617-14.             Filed August 24, 2016.

<u>James R. Monroe</u>, for petitioner.

<u>Marissa R. Lenius</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  These consolidated cases are before the Court on two

petitions for redetermination of employment status filed pursuant to section 7436.[1]

_____

[1] Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect for the years at issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.

[*2] By notices of determination of worker classification, respondent determined that Richard Scott Singer was to be classified as petitioner's employee for Federal employment tax purposes for 2010 and 2011.[2] Respondent determined that petitioner was liable for: (1) employment taxes of $8,660 and additions to tax of $4,515.12 for 2010; and (2) employment taxes of $8,048.70 for 2011. Mr. Singer, on behalf of petitioner, timely filed petitions in response to the notices of determination. We consolidated the cases for trial, briefing, and opinion.

After concessions,[3] the issues for decision are: (1) whether Mr. Singer should be classified as petitioner's employee for employment tax purposes for 2010 and 2011; and (2) whether petitioner's payment of personal expenses on behalf of Mr. Singer should be characterized as wages subject to Federal employment taxes.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the attached exhibits are incorporated by this reference.

---

[2] For convenience, we use the term "employment taxes" to refer to Federal income tax withholding, taxes under the Federal Insurance Contributions Act (FICA--Social Security taxes), and taxes under the Federal Unemployment Tax Act (FUTA--Social Security taxes).

[3] Respondent concedes that petitioner is not liable for any additions to tax.

**[*3]**  Petitioner is an S corporation that was incorporated in Florida in 1981 and reincorporated in Colorado in 1998.  During the years at issue petitioner was a Colorado corporation doing business in Florida.  At the time the petition was filed, petitioner's principal place of business was 1505 Stellar Drive, Oviedo, Florida.

Mr. Singer started Scott Singer Installations, Inc. (petitioner), in Miami in 1981.  The business was primarily engaged in servicing, repairing, and modifying recreational vehicles.  Petitioner also sold Kraftmaid cabinets used in the construction of homes.  Mr. Singer was the sole shareholder and president of petitioner and served as its sole corporate officer.

After operating the business in Florida for many years, Mr. Singer moved it to Colorado in 1999.  Although it was a "rough start", the operation quickly grew. On several occasions petitioner was forced to move to larger locations to meet increased demand.

In order to fund petitioner's growth, Mr. Singer began raising money from various sources.  In 2006 Mr. Singer established a $224,000 home equity line of credit.  In less than a year Mr. Singer had drawn on the entire line of credit and advanced the funds to petitioner.  In 2006 Mr. Singer also established an $87,443 line of credit by refinancing a home mortgage.  He likewise advanced the entire amount to petitioner within the same year.  In 2008 Mr. Singer established a

[*4] $115,000 general business line of credit and advanced all the funds to petitioner. Mr. Singer also borrowed $220,000 from his mother and her boyfriend and advanced all the funds to petitioner throughout 2007 and 2008. In sum, Mr. Singer advanced a total of $646,443 to petitioner between 2006 and 2008. Petitioner reported all of the advances as loans from shareholder on its general ledgers and Forms 1120S, U.S. Income Tax Return for an S Corporation, but there were no promissory notes between Mr. Singer and petitioner, there was no interest charged, and there were no maturity dates imposed.[4]

While petitioner was initially profitable, there was a decline in business in 2008. Mr. Singer made the decision to move petitioner to Florida in October 2009 so the Singers could be closer to family.

Unfortunately, the business continued to struggle even after moving back to Florida. Because Mr. Singer was unable to borrow from commercial banks, he financed petitioner's operations from 2009 through 2011 by borrowing an additional $513,099 from his mother and her boyfriend and advancing the funds to

---

[4] The loans were effectively back-to-back loans. Mr. Singer would personally borrow money and then advance the funds to petitioner.

[*5] petitioner.[5] Mr. Singer also began charging business expenses to personal credit cards.[6]

Petitioner was not profitable during the years at issue. Petitioner reported operating losses of $103,305 for 2010 and $235,542 for 2011. During the same years petitioner paid $181,872.09 of Mr. Singer's personal expenses by making payments from its bank account to the Singers' creditors.[7] These payments made on behalf of the Singers were treated on petitioner's general ledger and Forms 1120S as repayments of shareholder loans. Petitioner did not deduct the payments made on behalf of the Singers as business expenses.

Mr. Singer worked full time for petitioner and occasionally employed a service technician, two laborers, and an individual to help with petitioner's Internet sales. Petitioner filed Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, and Forms 941, Employer's Quarterly

---

[5] Again, there were no promissory notes executed between Mr. Singer and petitioner, but petitioner reported the advances on its general ledgers and Forms 1120S as loans from shareholder.

[6] At least $99,448.94 in business expenses charged to the Singers' personal credit cards in 2011 was unpaid. Petitioner reported the unreimbursed expenses as loans from shareholder on its 2011 general ledger and Form 1120S.

[7] Some of the Singers' personal expenses that petitioner paid included meals, groceries, retail purchases, car payments, and a home mortgage payment of over $6,000 per month.

**[*6]** Federal Tax Return, and paid employment taxes on wages paid to each employee except Mr. Singer--petitioner did not report paying wages to Mr. Singer during 2010 or 2011.

OPINION

I.    Introduction

Respondent determined that Mr. Singer was an employee of petitioner for the years at issue and that the $181,872.09 in payments petitioner made on behalf of Mr. Singer constituted wages that should have been subject to employment taxes.

We have jurisdiction under section 7436(a) to decide whether respondent's determination of worker classification is correct and to decide the proper amount of employment tax under that determination. See also Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 267-268 (2001); Glass Blocks Unlimited v. Commissioner, T.C. Memo. 2013-180. Therefore, we first consider whether Mr. Singer was an employee of petitioner. If he was an employee, then we must also determine whether the payments made on his behalf are wages subject to employment taxes.

[*7] II.     Employment Taxes

A.     Worker Classification

Employers are required to make periodic deposits of amounts withheld from employees' wages and amounts corresponding to the employer's share of FICA and FUTA tax. Secs. 6302, 6157; secs. 31.6302-1, 31.6302(c)-3, Employment Tax Regs. "Employee" is defined for FICA and FUTA purposes to include "any officer of a corporation" and "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee". See secs. 3121(d)(1) and (2), 3306(i). An officer of a corporation who performs more than minor services and receives remuneration for such services is a "statutory" employee for employment tax purposes. See Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 126 (2002), aff'd, 93 F. App'x 473 (3d Cir. 2004); secs. 31.3121(d)-1(b), 31.3306(i)-1(e), 31.3401(c)-1(f), Employment Tax Regs. An officer can escape statutory employee status only if he performs no services (or only minor services) for the corporation and neither receives nor is entitled to receive any remuneration, directly or indirectly, for services performed. See Veterinary Surgical Consultants, P.C. v. Commissioner, 117 T.C. 141, 144-145 (2001), aff'd, 54 F. App'x 100 (3d Cir.

**[*8]** 2002); secs. 31.3121(d)-1(b), 31.3306(i)-1(e), 31.3401(c)-1(f), Employment Tax Regs.

Petitioner does not object to respondent's determination that Mr. Singer was its employee for the years at issue, and the evidence clearly supports such a finding. As president of the company, Mr. Singer was petitioner's only officer. Furthermore, he performed substantial services for petitioner. Accordingly, we find that Mr. Singer was an employee of petitioner for the years at issue.

B.    Wage Determination

The next issue is whether petitioner's payments made on behalf of Mr. Singer should be characterized as wages subject to employment taxes. Petitioner argues that the advances Mr. Singer made to it were loans and that payments made on behalf of Mr. Singer represented repayments of those loans. Respondent argues that the funds advanced to petitioner were contributions to capital and that payments made on behalf of Mr. Singer were wages.

The proper characterization of the transfers as either loans or capital contributions is made by reference to all the evidence. See Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980); see also Herrera v. Commissioner, T.C. Memo. 2012-308, at *13, aff'd, 544 F. App'x 592 (5th Cir. 2013). Petitioner bears the burden of proving that the transfers were loans. See Rule 142(a); see also

[*9] <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 493.[8]  Courts have established a nonexclusive list of factors to consider when evaluating the nature of transfers of funds to closely held corporations.  Such factors include:  (1) the names given to the documents that would be evidence of the purported loans; (2) the presence or absence of a fixed maturity date; (3) the likely source of repayment; (4) the right to enforce payments; (5) participation in management as a result of the advances; (6) subordination of the purported loans to the loans of the corporation's creditors; (7) the intent of the parties; (8) identity of interest between creditor and stockholder; (9) the ability of the corporation to obtain financing from outside sources; (10) thinness of capital structure in relation to debt; (11) use to which the funds were put; (12) the failure of the corporation to repay; and (13) the risk involved in making the transfers.  <u>Calumet Indus., Inc. v. Commissioner</u>, 95 T.C. 257, 285 (1990); <u>see also</u> <u>In re Lane</u>, 742 F.2d 1311, 1314-1315 (11th Cir. 1984).

These factors serve only as aids in evaluating whether transfers of funds to closely held corporations should be regarded as capital contributions or as bona fide loans.  <u>Fin Hay Realty Co. v. United States</u>, 398 F.2d 694, 697 (3d Cir. 1968).

---

[8] Sec. 7491, which shifts the burden of proof to the Secretary in certain circumstances, does not apply to employment tax disputes.  <u>See</u> sec. 7491(a)(1).

**[\*10]** No single factor is controlling. <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 493. However, the ultimate question is whether there was a genuine intention to create a debt, with a reasonable expectation of repayment, and whether that intention comported with the economic reality of creating a debtor-creditor relationship. <u>Litton Bus. Sys., Inc. v. Commissioner</u>, 61 T.C. 367, 377 (1973).

Transfers to closely held corporations by controlling shareholders are subject to heightened scrutiny, however, and the labels attached to such transfers by the controlling shareholder through bookkeeping entries or testimony have limited significance unless these labels are supported by other objective evidence. <u>E.g.</u>, <u>Boatner v. Commissioner</u>, T.C. Memo. 1997-379, 1997 WL 473162, at \*3, <u>aff'd without published opinion</u>, 164 F.3d 629 (9th Cir. 1998).

Rather than analyze every factor on the debt-equity checklists, we confine our discussion to those points we find most pertinent. In our analysis we look at the relative financial status of petitioner at the time the advances were made; the financial status of petitioner at the time the advances were repaid; the relationship between Mr. Singer and petitioner; the method by which the advances were repaid; the consistency with which the advances were repaid; and the way the advances were accounted for on petitioner's financial statements and tax returns. After looking at all these criteria in the light of the other factors traditionally

**[*11]** distinguishing debt from equity, particularly the intent factor, we believe Mr. Singer intended his advances to be loans and we find that his intention was reasonable for a substantial portion of the advances. Consequently, we also find that petitioner's repayments of those loans are valid as such and should not be characterized as wages subject to employment taxes.

We start by discussing evidence of Mr. Singer's intention to create a debtor-creditor relationship with petitioner and follow with a discussion of the extent to which Mr. Singer had a reasonable expectation of repayment.

First, we look to the fact that petitioner reported the advances as loans on its general ledgers and its Forms 1120S.[9] Petitioner's balance sheets report Mr. Singer's advances as increases in loans from Mr. Singer each year. Additionally, petitioner consistently reported the expenses it was paying on behalf of the Singers as repayments of shareholder loans rather than reporting the payments as business expenses. We believe this consistent reporting indicates Mr. Singer and petitioner intended to form a debtor-creditor relationship and that petitioner conformed to that intention. Second, petitioner's payments on behalf of the Singers were

---

[9] While we recognize that transfers by Mr. Singer as the controlling shareholder (and the corresponding labels attached to such transfers) are subject to heightened scrutiny, we believe Mr. Singer provided enough objective evidence to overcome the higher standard.

[*12] consistent regardless of the value of the services Mr. Singer provided to petitioner. Many of the payments petitioner made were the Singers' recurring monthly expenses, including their home mortgage and personal vehicle loan payments. The consistency of these payments, both in time and in amount, is characteristic of debt repayments. Finally, and most importantly, the fact that petitioner made payments when the company was operating at a loss strongly suggests a debtor-creditor relationship existed. "A fundamental difference between a creditor and an equity investor is that the former expects repayment of principal and compensation for the use of money * * * whereas the latter understands that the return of its investment, and any return on that investment, depend on the success of the business." David C. Garlock, Federal Income Taxation of Debt Instruments 1039-1040 (6th ed. 2010). Consequently, we believe Mr. Singer's advances were intended to be loans because Mr. Singer was repaid even when the business was operating at a loss and the repayments were therefore not dependent on the success of the business.

Now that we have found Mr. Singer and petitioner intended to form a debtor-creditor relationship, the next question is whether Mr. Singer had a reasonable expectation of repayment. When Mr. Singer advanced funds to petitioner between 2006 and 2008, the business was well established and

[*13] successful.  Petitioner had been operating for many years, and the business was growing at a rapid pace.  Because the business was operating profitably and showed signs of growth, we believe that Mr. Singer was reasonable in assuming his loans would be repaid.  Accordingly, we find petitioner and Mr. Singer intended the advances to create debt rather than equity, that there was a reasonable expectation at the time the initial advances were made that such advances would be repaid, and that such intention comported with the economic reality of creating a debtor-creditor relationship.[10]  See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 377.  However, we cannot find that all of the advances were loans.

While we believe that Mr. Singer had a reasonable expectation of repayment for advances made between 2006 and 2008, we do not find that a similarly reasonable expectation of repayment existed for later advances.  When the recession occurred in 2008 and petitioner's business dropped off sharply, Mr. Singer should have known that future advances would not result in consistent repayments.  When neither petitioner nor Mr. Singer was able to raise funds from

---

[10]  We recognize that Mr. Singer's advances have some of the characteristics of equity--the lack of a promissory note, the lack of a definitive maturity date, and the lack of a repayment schedule--but we do not believe those factors outweigh the evidence of intent.  See Johnson v. Commissioner, T.C. Memo. 1977-436 (finding that advances to corporation were loans even though there was no note, no specific time fixed for repayment, and no interest, because intent of parties to create loan was overwhelming and outweighed other factors).

**[*14]** unrelated third parties, Mr. Singer must have recognized that the only hope for recovery of the amounts previously advanced to petitioner was an infusion of capital subject to substantial risk. After 2008 the only source of capital was from Mr. Singer's family and Mr. Singer's personal credit cards. No reasonable creditor would lend to petitioner. Accordingly, we find that advances made in 2008 and earlier were bona fide loans and that advances made after 2008 were more in the nature of capital contributions. We also find that petitioner had a sufficient outstanding loan balance at the time the repayments were made so that loan repayments made during the years at issue are valid as such.

In reaching our holding, we have considered all arguments made, and to the extent not mentioned, we consider them irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered for petitioner</u>.